E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| ESTATE of BECKY MCILRATH, by and through its co-administrators, JAREN DEPENNING and BEVERLY DEPENNING; JAMES HARLEY MCILRATH IV, individually and by and through the ESTATE OF BECKY MCILRATH; and G.E.M., by and through the ESTATE OF BECKY MCILRATH and her father and next friend, JAMES HARLEY MCILRATH III,<br><br>        Plaintiff,<br><br>v.<br><br>THE IOWA CLINIC, P.C.;<br>THOMAS HANSEN, M.D.;<br>ENDO PHARMACEUTICALS, INC.; and<br>ENDO HEALTH SOLUTIONS,<br><br>        Defendants. | CASE NO. _____<br><br><br>**PETITION AT LAW<br>& JURY DEMAND** |

**COME NOW** Plaintiffs, the Estate of Becky McIlrath by and through its co-administrators, Jaren DePenning and Beverly DePenning, James Harley McIlrath IV, individually and by and through the Estate of Becky McIlrath, and G.E.M., by and through the Estate of Becky McIlrath and her father and next friend, James Harley McIlrath III ("Plaintiffs"), and for their cause of action against Defendants The Iowa Clinic, P.C.; Thomas Hansen, M.D.; Endo Health Solutions Inc.; and Endo Pharmaceuticals, Inc.; states as follows:

### PRELIMINARY STATEMENT

1.     The opioid epidemic has wreaked immeasurable harm to individuals and families in Iowa and throughout the United States.

**Exhibit 1**

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

2.    Iowans deserve appropriate pain management care and the ability to make informed decisions about their care based on accurate and complete information regarding the costs and benefits of treatment.

3.    The Iowa Clinic's and Dr. Thomas Hansen's negligent and reckless pain management treatment of Becky McIlrath ("Becky") directly caused Becky to overdose prescription opioids that took her life in November 2017.

4.    Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. ("Endo") purposefully engaged in a deceptive, negligent, reckless and fraudulent marketing campaign and course of conduct intended to, and did in fact, cause Becky's prescribers to negligently and recklessly prescribe opioids for chronic pain to Becky for the purpose of increasing Endo's profits and deprived Becky and her treating physicians of the ability to make informed decisions based on accurate and complete information, which proximately caused the injuries suffered by Becky for which the Plaintiffs seek damages.

## JURISDICTION AND VENUE

5.    The Iowa District Court in and for Polk County has proper jurisdiction over the parties pursuant to Iowa Code § 602.6101.

6.    The amount in controversy exceeds the jurisdictional requirements.

7.    This Court has personal jurisdiction over Defendants as they conduct business in Iowa, purposefully direct or directed their actions toward Iowa, and/or have the requisite minimum contacts with Iowa necessary to constitutionally permit the Court to exercise jurisdiction.

8.   Becky's injuries were sustained at her home in Polk County, Iowa.

9.   Venue is proper pursuant to Iowa Code § 616.18.

## PARTIES

10.   This action is brought by the duly authorized and acting Co-Administrators of the Estate of Becky McIlrath, Polk County Case No. ESPR075345.

11.   At all material times hereto, Plaintiffs James Harley McIlrath IV was the child of Becky and a resident of Grinnell, Poweshiek County, Iowa.

12.   At all material times hereto, G.E.M. was the minor child of Becky and a resident of Grinnell, Poweshiek County, Iowa.

13.   G.E.M. has no legally appointed guardian or conservator.

14.   James Harley McIlrath III is G.E.M.'s father and next friend.

15.   At all times material hereto, Defendant, Thomas Hansen, M.D. (hereafter "Dr. Hansen"), was a physician licensed to practice medicine in Iowa and regularly engaged in the practice of medicine in West Des Moines, Dallas County, Iowa.

16.   At all material times hereto, Dr. Hansen held himself out to the public as a specialist in pain management for treatment of patients in Becky's condition.

17.   Defendant, The Iowa Clinic, P.C., is an Iowa corporation with its principal place of business located in West Des Moines, Dallas County, Iowa.

18.   At all material times hereto, Dr. Hansen was an employee, agent, owner or shareholder of The Iowa Clinic.

19.   Defendant, Endo Health Solutions, Inc. is a Delaware corporation with

its principal place of business located in Malvern, Pennsylvania.

20.     Defendant, Endo Pharmaceuticals Inc., is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware Corporation with its principal place of business in Malvern Pennsylvania.

21.     Endo Health Solutions Inc. and Endo Pharmaceuticals are collectively referred to as "Endo".

22.     Endo develops, markets, and sells prescription drugs, including Percocet, in Iowa.

## STATEMENT OF THE CLAIM

### *Defendants Dr. Hansen and The Iowa Clinic*

23.     At all times material hereto, Defendant Thomas Hansen, M.D., provided medical services to Becky McIlrath in the form of prescribing pain medication, including but not limited to Percocet.

24.     During the providing of the medical services to Becky, Thomas Hansen, M.D., was acting as the agent/employee of The Iowa Clinic, P.C. and was providing medical services to Becky within the scope of that agency/employment.

25.     During the administering of medical services to Becky, Thomas Hansen, M.D., negligently treated Becky for non-cancer pain-related issues and such negligence included failing to adequately monitor Becky's opioid prescriptions and use and negligently treating Becky's pain by prescribing opioids for non-cancer chronic pain, including migraine headaches.

26.    During the administrating of medical treatment to Becky up to and including November 16, 2019, Thomas Hansen, M.D., owed a duty to Becky to perform the medical services within an acceptable standard of medical care within the medical community and Thomas Hansen, M.D., breached the standard of care by negligently treating Becky's pain, negligently prescribing opioids, and negligently monitoring Becky's opioid use, which led to an overdose of said prescriptions that took Becky's life.

27.    As a direct and proximate result of the breach of applicable standard of medical care by Thomas Hansen, M.D., which resulted in the death of Becky, Becky suffered pain and suffering in the past, loss of income to the estate, past medical expenses, loss of function, and other damages.

28.    The harm and death endured by Becky was the direct and proximate cause of the medical errors committed by Thomas Hansen, M.D.

29.    Thomas Hansen, M.D. did not do what a reasonable, ordinary doctor would do treating Becky. His treatment deviated from the appropriate standard of care during the treatment he provided to Becky, which directly caused Becky's death.

*Endo*[1]

30.    Before the 1990s, generally accepted medical standards provided that opioids should be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. The use of opioids for chronic pain was discouraged or prohibited.

---

[1]    The allegations asserted herein largely mirror the allegations asserted against Endo in multiple claims brought by governmental entities in other jurisdictions.

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

31.    To expand the market for its opioid products, including Percocet, Endo developed a marketing scheme based on deception.

32.    Endo used both direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use.

33.    Endo's deceptive, negligent, and fraudulent scheme was designed to, and did in fact, cause prescribers, specifically Becky's prescribers, to negligently and recklessly overprescribe opioid medication for patients in Becky's condition, including Becky.

### A.    Endo Used Multiple Avenues To Disseminate Its False And Deceptive Statements About Opioids.

34.    Endo spread its false and deceptive statements by marketing its branded opioids directly to doctors, including Becky's prescribers, and patients, including Becky, in Iowa.

35.    Endo also deployed seemingly unbiased and independent third parties that they controlled to spread its false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain to doctors, including Becky's prescribers, and patients, including Becky, in Iowa.

### 1.    Endo spread false and deceptive statements through direct marketing of its branded opioids.

36.    Endo's branded ads deceptively portrayed the benefits of opioids for chronic pain.

37.    Endo promoted the use of opioids for chronic pain through "detailers" –

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.

38.    Endo also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Endo. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers gave the false impression that they were providing unbiased and medically accurate presentation. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Endo's prior misrepresentations about the risks and benefits of opioids.

39.    Endo employed the same marketing plans and strategies and deployed the same messages in Iowa as they did nationwide. Across the pharmaceutical industry, "core message" development was funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensured that Endo's messages were accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising and in each sales territory.

40.    Eno ensured marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

nationally coordinated advertising. Endo's sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

> **2.    Endo used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids.**

41.    Endo also deceptively marketed opioids in Iowa through unbranded advertising – *i.e.*, advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Endo controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Endo controlled the distribution of its "core messages" via its own detailers and speaker programs, Endo similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CMEs, and medical conferences and seminars. To this end, Endo used third-party public relations firms to help control those messages when they originated from third parties.

42.    Endo also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. Endo also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and

objective source.

43.     Endo used third parties that they funded, directed, and controlled to carry out and conceal its scheme to deceive doctors, including Becky's prescribers, and patients, including Becky, about the risks and benefits of long-term opioid use for chronic pain.

### a. Key Opinion Leaders ("KOLs")

44.     Endo also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Endo because their public positions supported the use of opioids to treat chronic pain. These doctors are known as "key opinion leaders" or "KOLs."

45.     Endo paid KOLs to serve as consultants or on its advisory boards and to give talks or present CMEs, and its support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Endo by advancing its marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Endo.

46.     KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. Endo created opportunities for KOLs to participate in research studies Endo suggested or chose and then cited and promoted favorable studies or articles by its KOLs. By contrast, Endo did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

47.    Endo's KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Endo was able to direct and exert control over each of these activities through its KOLs. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

48.    Pro-opioid doctors were one of the most important avenues that Endo used to spread its false and deceptive statements about the about the risks and benefits of long-term opioid use.   Endo knew that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

49.    Endo utilized many KOLs, including many of the same ones. Two of the most prominent are described below.

### (1)    Russell Portenoy

50.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Endo identified and promoted to further its marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Endo.

51.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which

endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded in part by Endo.

52.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast in Iowa and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[2]

### (2)     Lynn Webster

53.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Endo. At the same time, Dr. Webster was receiving funding from Endo.

54.     During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug

---

[2]     Good Morning America television broadcast, ABC News (Aug. 30, 2010).

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

55.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo.

56.     In 2011, Dr. Webster presented, via webinar, a program titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk.* Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach Iowa doctors, including Becky's prescribers.

57.     Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), a book that is still available online, when faced with signs of aberrant

behavior, increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."

### b.    Front Groups

58.    Endo also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of, *inter alia*, Endo, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted Endo by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Endo.

59.    These Front Groups depended on, *inter alia*, Endo for funding. Endo also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, Endo made sure that the Groups would generate only the messages Endo wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

60.    Endo utilized many Front Groups. Several of the most prominent are described below, but there are many others, including the American Pain Society

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

### (1)    American Pain Foundation ("APF")

61.    The most prominent of Endo's Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding.

62.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Iowans.

63.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely

dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

64.     APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. APF functioned largely as an advocate for the interests of opioid manufacturers, including Endo, not patients.

65.     In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

66.     APF assisted in other marketing projects for drug companies. One project funded by another drug company -- *APF Reporter's Guide: Covering Pain and Its Management* (2009) -- recycled text that was originally created as part of the company's training document.

67.     The same drug company made general grants, but even then it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this

year — this would be a very good issue on which to use some of that. How does that work?"

68.    The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and opioid manufacturers, including Endo. APF's clear lack of independence — in its finances, management, and mission — and its willingness to allow opioid manufacturers, including Endo, to control its activities and messages support an inference that Endo that worked with it was able to exercise editorial control over its publications.

69.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and opioid manufacturers, including Endo, stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

### (2)    American Academy of Pain Medicine ("AAPM")

70.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of opioid manufacturers, including Endo, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

71.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members

16

**016**

paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Endo was a member of the council and presented deceptive programs to doctors who attended this annual event.

72.     AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[3]

73.     AAPM's staff understood they and their industry funders were engaged in a common task. Opioid manufacturers, including Endo, were able to influence

---

[3]     Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/ viewarticle/500829.

AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

74.     In addition, treatment guidelines were particularly important in securing acceptance for chronic opioid therapy. They were relied upon by doctors, including Becky's doctors, targeted by opioid manufacturers, including Endo. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo discussed treatment guidelines with doctors during individual sales visits.

75.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The consensus statement remained on AAPM's website until 2011 and was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

76.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

77.     The 2009 Guidelines promote opioids as "safe and effective" for treating

chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Endo, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Iowa during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

78.     Opioid manufacturers, including Endo, widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

79.     Opioid manufacturers, including Endo, worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, opioid manufacturers, including Endo, combined their efforts through the Pain Care Forum (PCF), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Endo) and various Front Groups, almost all of which received substantial funding from the opioid manufacturers, including Endo. Among other projects, PCF worked to ensure that an

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which Endo determined would reduce prescribing.

### B.    Endo's Marketing Scheme Misrepresented The Risks And Benefits of Opioids.

80.    To convince doctors, including Becky's prescribers, and patients, including Becky, in Iowa that opioids can and should be used to treat chronic pain, Endo had to convince them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Endo made claims that were not supported by or were contrary to the scientific evidence.

81.    Endo's deceptive, negligent, reckless and fraudulent marketing scheme convinced Becky's prescribers and Becky that opioids should be used to treat patients in Becky's condition.

### 1.    Endo falsely trivialized or failed to disclose the known risks of long-term opioid use.

82.    To convince doctors, including Becky's prescribers, and patients, including Becky, that opioids are safe, Endo deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

83.   *First,* Endo falsely claimed that the risk of addiction is low, and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Two illustrative examples of these false and deceptive claims are described below:

  a.   Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

  b.   Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain,* which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

84.   The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

85.    The FDA further exposed the falsity of Endo's claims about the low risk of addiction when it announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

86.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York.

87.   ***Second,*** Endo falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Endo called this phenomenon "pseudoaddiction" – a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL Endo – and falsely claimed that pseudoaddiction is substantiated by scientific evidence.

88.   For example, Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

89.   The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

90.   Endo has effectively repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

in fact has been abandoned by some of its proponents," the State of New York, in its 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Consistent with this, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

91.     ***Third,*** Endo falsely instructed doctors, including Becky's prescribers, and patients, including Becky, that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. Endo's misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.

92.     For example, Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

93.     Once again, the 2016 CDC Guideline confirms the falsity of these misrepresentations. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts,

urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

94.    *Fourth*, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Endo falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

95.    For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

96.    Endo deceptively minimized the significant symptoms of opioid withdrawal which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to

prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

97.     *Fifth*, Endo falsely claimed that doctors, including Becky's prescribers, and patients, including Becky, could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Endo's efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors, including Becky's prescribers, would have abandoned treatment when patients, including Becky, built up tolerance and lower dosages did not provide pain relief. Two illustrative examples are described below:

a.      Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

b.      Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on Endo's website. In Q&A format, it asked "If I take the opioid now, will it

work later when I really need it?" The response is, "The dose can
be increased. You won't 'run out' of pain
relief."

98.    These claims conflict with the scientific evidence, as confirmed by the
FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-
dose opioids for chronic pain are not established" while the "risks for serious harms
related to opioid therapy increase at higher opioid dosage." More specifically, the CDC
explains that "there is now an established body of scientific evidence showing that
overdose risk is increased at higher opioid dosages." The CDC also states that "there
is an increased risk for opioid use disorder, respiratory depression, and death at
higher dosages."

99.    The 2016 CDC Guideline reinforces earlier findings announced by the
FDA. In 2013, the FDA acknowledged "that the available data do suggest a
relationship between increasing opioid dose and risk of certain adverse events." For
example, the FDA noted that studies "appear to credibly suggest a positive
association between high-dose opioid use and the risk of overdose and/or overdose
mortality."

100.    These numerous, longstanding misrepresentations of the risks of long-
term opioid use spread by Endo successfully convinced doctors, including Becky's
prescribers, and patients, including Becky, to discount those risks and ultimately
caused Becky's overdose.

### 2. Endo grossly overstated the benefits of chronic opioid therapy.

101.    To convince doctors and patients that opioids should be used to treat

chronic pain, Endo also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Endo falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

102.    For example, Endo falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples are described below:

     a.    Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

     b.    *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo, among others, taught that relief of pain by opioids, by itself, improved patients' function.

     c.    Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

d.   Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

e.   Endo's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

103.   These claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

a.   "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

b.   "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

c.   "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed,

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

such as low back pain, headache, and fibromyalgia."

104.   The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

105.   Endo also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, the Endo-sponsored CME put on by NIPC, *Persistent Pain in the Older Adult*, counseled that acetaminophen should be used only short-term and includes five slides on the FDA's restrictions on acetaminophen and its adverse effects, including severe liver injury and anaphylaxis (shock). In contrast, the CME downplays the risk of opioids, claiming opioids have "possibly less potential for abuse than in younger patients," and does not list respiratory depression among the adverse effects.

106.   Endo routinely failed to disclose in its educational and marketing materials the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy," in which the patient becomes more sensitive to certain painful stimuli over time; or experiences hormonal or endocrine dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome ("NAS") (when an infant exposed to opioids prenatally painfully withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazepines, which are often also

used by pain patients to treat post-traumatic stress disorder and anxiety.

107. Once again, these misrepresentations by Endo contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

### C. Endo Knew That Its Marketing Of Opioids Was False And Deceptive, It Fraudulently Concealed Their Misconduct.

108. Endo made, promoted, and profited from its misrepresentations about the risks and benefits of opioids for chronic pain even though it knew that its misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Endo of this, and Endo had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Endo's misrepresentations, and Endo has recently entered agreements

prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

109. Moreover, at all times relevant to this Complaint, Endo took steps to avoid detection of and to fraudulently conceal its deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, Endo disguised its own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. Endo purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Endo's false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

110. Endo also never disclosed its role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Endo exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement.

111. Finally, Endo manipulated its promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Endo distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for Endo's deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could

it have been detected by the Plaintiffs.

112.    Thus, Endo successfully concealed from the medical community (including Becky's prescribers) and patients (including Becky) facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. The Plaintiffs did not know of the existence or scope of Endo's industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

> **D.    Endo's Deceptive, Negligent, Reckless and Fraudulent Marketing Scheme Caused Becky's Opioid Addiction, Overdose, and Death.**

113.    Endo's misrepresentations deceived doctors, including Becky's prescribers, and patients, including Becky, about the risks and benefits of long-term opioid use.

114.    Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them.

115.    Endo's deceptive, negligent, reckless and fraudulent marketing scheme caused Becky's prescribers to prescribe opioids for her chronic pain conditions such as headaches and migraines.

116.    Absent Endo's deceptive, negligent, reckless and fraudulent conduct, Becky's prescribers would not have negligently and/or recklessly overprescribed opioids to treat her pain and/or otherwise mismanaged her pain treatment, which caused Becky's eventual overdose and death.

117.    Endo's deceptive, negligent, reckless and fraudulent conduct also caused

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

Becky to purchase and use opioids for her chronic pain believing they were safe and effective.

118.   Absent Endo's deceptive, negligent, reckless and fraudulent marketing scheme, Becky would not have used opioids to treat her headaches and migraines and/or would have used less of them.

119.   Endo's deceptive, negligent, reckless and fraudulent marketing scheme was a proximate cause of Becky's opioid dependency, overdose, and death.

120.   Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses.

121.   Contrary to Endo's misrepresentations, most opioid addiction, including Becky's addiction, began with legitimately *prescribed* opioids, and therefore could have been prevented had Endo's representations to Becky's prescribers been truthful.

122.   Endo's creation, through negligent, reckless, false and deceptive advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed families throughout Iowa, including Becky's family.

123.   Endo knew and should have known about these harms that its deceptive, negligent, reckless and fraudulent marketing has caused. Endo closely monitored its sales and the habits of prescribing doctors. Endo's sales representatives, who visited doctors and attended CMEs, knew which doctors were

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

receiving their messages and how they were responding. Endo also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. It knew – and, indeed, intended – that its misrepresentations would persuade doctors, including Becky's prescribers, to prescribe and patients, including Becky, to use their opioids for chronic pain.

124.   Endo's actions are not permitted nor excused by the fact that its drug labels may have allowed or did not exclude the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give Endo license to misrepresent the risks and benefits of opioids. Indeed, Endo's misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

125.   Nor is Endo's causal role broken by the involvement of doctors, including Becky's prescribers. Endo's marketing efforts were ubiquitous and highly persuasive. Its deceptive messages tainted the sources doctors, including Becky's prescribers, could rely on for information and prevented them from making informed treatment decisions. Endo also was able to harness and hijack what doctors, including Becky's prescribers, wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

## COUNT I
## PROFESSIONAL NEGLIGENCE
### *(The Iowa Clinic and Dr. Hansen)*

126.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

127.   Dr. Hansen was negligent in one or more of the following particulars as

to his treatment of Becky McIlrath:

    a.    Failing to prescribe appropriate prescriptions for the treatment of Becky's pain;

    b.    Prescribing opioids for the treatment of Becky's symptoms;

    c.    Failing to properly monitor Becky's opioid prescription and use;

    d.    Failing to discontinue the prescription for opioids for a patient in Becky's condition;

    e.    Continuing to prescribe opioids for the treatment of Becky's condition until her death;

    f.    Failing to use the degree of skill, care and learning ordinarily possessed and exercised by other physicians in similar circumstances; and

    g.    Failing to use the degree of skill, care and learning ordinarily possessed and exercised by pain management specialists in similar circumstances.

128.    Said negligence is the cause of injury and damage to Becky and Plaintiffs.

129.    The Iowa Clinic, by and through the acts of its agents, staff, employees and contracted employees were negligent in the handling of Becky's medical care.

130.    The Iowa Clinic is liable for the negligence of Dr. Hansen because it had a nondelegable duty to Becky to provide competent medical care for its services.

131.    At all material times, Dr. Hansen was acting within the scope of his employment with The Iowa Clinic.

132.    At all material times, agents, staff, employees, and contracted employees of The Iowa Clinic who provided medical services to Becky were acting within the scope of their employment with The Iowa Clinic.

E-FILED 2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

133.    At all material times, The Iowa Clinic represented and advertises that Dr. Hansen and its medical providers are employees and/or agents of The Iowa Clinic.

134.    Becky McIlrath believed from these facts that Dr. Hansen and The Iowa Clinic's medical providers were employees/agents with apparent authority of The Iowa Clinic.

135.    The Iowa Clinic is responsible for the negligence of its agents, staff employees, and contracted employees under theories of vicarious liability, respondeat superior, employer-employee liability, and/or principal agent.

136.    As a result of the negligence of Dr. Hansen and The Iowa Clinic, the Plaintiffs have suffered and incurred damages, which include, but are not limited to, losses to the present value of the decedent's estate, lost interest on burial expenses, personal injury, physical pain, mental suffering, mental anguish, emotional trauma, and other damages.

## COUNT II
## COMMON LAW NEGLIGENCE
### *(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

137.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

138.    Endo had a duty of care to Plaintiffs to exercise the degree of care which a reasonably careful person would use under similar circumstances and to conduct its business of manufacturing, promoting, marketing, and/or distributing opioids in compliance with applicable State law.

139.    Endo breached its duties through its false and misleading statements and omissions, and/or its violations of Iowa law, in the course of manufacture,

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

distribution, sale, and/or marketing of opioid drugs within the State of Iowa.

140.   Endo breached its duty of care by making and/or disseminating deceptive statements, including, but not limited to, the following:

a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.   Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

d.   Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.   Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.   Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.   Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.   Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious

misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.    Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.    Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.    Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.    Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.    Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

141.   As a foreseeable consequence of Endo's breaches of its duties, Becky and Plaintiffs suffered direct and consequential damages.

142.   Endo's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

recklessness, gross negligence, and willful and wanton conduct.

## COUNT III
## FAILURE TO WARN
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

143.  Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

144.  Endo sold or distributed Percocet.

145.  Endo is engaged in the business of selling or distributing Percocet.

146.  Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

    a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

    b.    Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c.    Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

    d.    Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

    e.    Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or

operated;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations — including over $5 million to the organization responsible for many of the most egregious misrepresentations — that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer

pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.   Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

147.   Endo's statements deemphasized, diluted, and played down the effect of warnings otherwise provided by Endo in the sale or distribution of Percocet.

148.   The foreseeable risks of harm posed by Percocet could have been reduced or avoided by the provision of reasonable instructions or warnings and the absence of deceptive statements regarding Endo's opioid products.

149.   The omission of the instructions or warnings and Endo's overpromotion, dilution, deemphasis, and playing down of its warnings rendered Percocet not reasonably safe for patients in Becky's condition.

150.   The omission of the instructions or warnings and Endo's overpromotion, dilution, deemphasis, and playing down of its warnings was a proximate cause of Plaintiffs' damages.

151.   Endo's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute recklessness, gross negligence, and willful and wanton conduct.

## COUNT IV
## COMMON LAW FRAUD
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

152.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

153.   As alleged herein, Endo engaged in false representations and

concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

154.    Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

    a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

    b.    Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c.    Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

    d.    Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

    e.    Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

    f.    Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

    g.    Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

    h.    Providing needed financial support to pro-opioid pain

organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.    Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.    Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.    Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.    Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.    Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

155.    These false representations and concealments were reasonably calculated to deceive the Becky's prescribers and consumers of its opioid products, including Becky, were made with the intent to deceive, and did in fact deceive Becky

and the physicians who prescribed Endo's opioid products to Becky.

156.    But for these false representations and concealments of material fact, Becky would not have become addicted to overdosed from Endo's opioid products.

157.    As a direct and proximate cause of Defendants' fraudulent conduct, Becky and Plaintiffs have been injured.

**COUNT V**
**CONSUMER FRAUD**
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

158.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

159.    The Iowa Consumer Frauds Act, Iowa Code ch. 714H, prohibits, in connection with consumer transactions, unfair, deceptive, false, sales practices that mislead consumers about the nature of the product they are receiving.

160.    As alleged herein, Endo, at all times relevant to this Complaint, violated the Iowa Consumer Frauds Act by making deceptive representations about the use of opioids to treat chronic non-cancer pain.

161.    Endo also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Endo's omissions rendered even their seemingly truthful statements about opioids deceptive.

162.    Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

      a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.   Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

d.   Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.   Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.   Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.   Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.   Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.   Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

    j.    Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

    k.    Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

    l.    Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

    m.    Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

    n.    Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

163.    These false representations and concealments were reasonably calculated to deceive the Becky's prescribers and consumers of its opioid products, including Becky, were made with the intent to deceive, and did in fact deceive Becky and the physicians who prescribed Endo's opioid products to Becky.

164.    But for these false representations and concealments of material fact, Becky would not have become addicted to overdosed from Endo's opioid products.

165.    As a direct and proximate cause of Defendants' fraudulent conduct, Becky and the Plaintiffs have suffered actual damages.

166.    By engaging in the conduct set forth above, Endo acted willfully and

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

wantonly toward Plaintiffs entitling Plaintiffs to statutory damages up to three times the amount of actual damages.

## COUNT VI
## LOSS OF CONSORTIUM – G.E.M.
### *(All Defendants)*

167.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

168.    As a direct and proximate result of the negligence of all Defendants, G.E.M. has suffered and will continue to suffer in the future the following injuries and damages:

      a.      Past and future loss of financial support from her mother Becky McIlrath; and

      b.      Past and future loss of consortium with her mother Becky McIlrath.

## COUNT VII
## LOSS OF CONSORTIUM – James H. McIlrath IV
### *(All Defendants)*

169.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

170.    As a direct and proximate result of the negligence of all Defendants, James H. McIlrath IV has suffered and will continue to suffer in the future the following injuries and damages:

      a.      Past and future loss of financial support from his mother Becky McIlrath;

      b.      Past and future loss of consortium with his mother Becky McIlrath.

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

**COUNT VIII**
**PUNITIVE DAMAGES (Iowa Code §668A.1)**
*(All Defendants)*

171.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

172.    By engaging in the conduct set forth above, Endo acted toward Plaintiffs with oppression, fraud, malice, gross negligence, willful and wanton, and/or reckless disregard for Becky's rights, her health, her physical and mental well-being, so as to inflict the damage complained of.

173.    By engaging in the conduct set forth above, Dr. Hansen and The Iowa Clinic acted toward Plaintiffs with oppression, fraud, malice, gross negligence, willful and wanton, and/or reckless disregard for Becky's rights, her health, her physical and mental well-being, so as to inflict the damage complained of.

174.    Accordingly, in addition to the actual damages herein alleged, Plaintiffs are entitled to an award of exemplary damages because of Defendants' conduct.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against The Iowa Clinic, Thomas Hansen, M.D., Endo Health Solutions Inc., and Endo Pharmaceuticals, Inc., in a reasonable amount adequate to compensate for Plaintiffs' injuries with interest and costs as provided by law, including actual, general and for punitive and exemplary damages as provided by law, attorneys' fees, together with interest as provided by law and the costs of this action.

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

## JURY DEMAND

Plaintiffs hereby demand a jury trial of all issues contained herein so triable in this action.

Respectfully submitted,
*/s/ Scott M. Wadding*
Scott M. Wadding  AT0010447
SEASE & WADDING
104 Southwest Fourth Street
Des Moines, Iowa 50309
Telephone: (515) 883-2222
Facsimile: (515) 883-2233
swadding@seasewadding.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2019, I electronically filed the foregoing document with the Clerk of Court using the EDMS system which sent notifications of said filing to all EDMS participants.

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| ESTATE of BECKY MCILRATH, by and through its co-administrators, JAREN DEPENNING and BEVERLY DEPENNING; JAMES HARLEY MCILRATH IV, individually and by and through the ESTATE OF BECKY MCILRATH; and G.E.M., by and through the ESTATE OF BECKY MCILRATH and her father and next friend, JAMES HARLEY MCILRATH III,<br><br>        Plaintiff,<br><br>v.<br><br>THE IOWA CLINIC, P.C.; THOMAS HANSEN, M.D.; ENDO PHARMACEUTICALS, INC.; and ENDO HEALTH SOLUTIONS,<br><br>        Defendants. | CASE NO. _____<br><br><br>**ORIGINAL NOTICE** |

TO THE ABOVE-NAMED DEFENDANTS:

You are notified that a petition has been filed in the office of the clerk of this court naming you as the defendant in this action. A copy of the petition (and any documents filed with it) is attached to this notice. The attorney for the Plaintiff is Scott M. Wadding of Sease & Wadding, whose address is 104 SW 4th Street, Suite A, Des Moines, Iowa 50309. The attorney's telephone number is (515) 883-2222; facsimile number (515) 883-2233; email: swadding@seasewadding.com.

You must serve a motion or answer within 20 days after service of this original notice upon you and, within a reasonable time thereafter, file your motion or answer with the Clerk of Court for Ringgold County. If you do not, judgment by default may be rendered against you for the relief demanded in the petition.

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.** You must electronically file the Appearance and Answer using the Iowa Judicial Branch Electronic Document Management System (EDMS) at https://www.iowacourts.state.ia.us/EFile, unless you obtain from the court an exemption from electronic filing requirements.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM**

E-FILED  2019 NOV 01 3:34 PM POLK - CLERK OF DISTRICT COURT

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISON VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at (515) 286-3394.  If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942.

# STATE OF IOWA JUDICIARY

*Case No.*  LACL146210

*County*  Polk

*Case Title*  ESTATE OF BECKY MCILRATH ET AL VS THE IOWA CLINIC

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(515) 286-3394**   . (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942**.)

*Date Issued*  11/05/2019 11:19:03 AM



*District Clerk of* Polk          *County*

/s/ Valerie Morgan

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| ESTATE of BECKY MCILRATH, by and through its co-administrators, JAREN DEPENNING and BEVERLY DEPENNING; JAMES HARLEY MCILRATH IV, individually and by and through the ESTATE OF BECKY MCILRATH; and G.E.M., by and through the ESTATE OF BECKY MCILRATH and her father and next friend, JAMES HARLEY MCILRATH III,<br><br>      Plaintiff,<br><br>v.<br><br>THE IOWA CLINIC, P.C.; THOMAS HANSEN, M.D.; PIER OSWEILER, ARNP; ENDO PHARMACEUTICALS, INC.; and ENDO HEALTH SOLUTIONS,<br><br>      Defendants. | CASE NO. LACL146210<br><br><br>**FIRST AMENDED PETITION AT LAW & JURY DEMAND** |

**COME NOW**, pursuant to Iowa Rule of Civil Procedure 1.402(4), Plaintiffs, the

Estate of Becky McIlrath by and through its co-administrators, Jaren DePenning and

Beverly DePenning, James Harley McIlrath IV, individually and by and through the

Estate of Becky McIlrath, and G.E.M., by and through the Estate of Becky McIlrath

and her father and next friend, James Harley McIlrath III ("Plaintiffs"), and for their

cause of action against Defendants The Iowa Clinic, P.C.; Thomas Hansen, M.D.; Pier

Osweiler, ARNP; Endo Health Solutions Inc.; and Endo Pharmaceuticals, Inc.; states

as follows:

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

## PRELIMINARY STATEMENT

1.     The opioid epidemic has wreaked immeasurable harm to individuals and families in Iowa and throughout the United States.

2.     Iowans deserve appropriate pain management care and the ability to make informed decisions about their care based on accurate and complete information regarding the costs and benefits of treatment.

3.     The Iowa Clinic's, Dr. Thomas Hansen's and Pier Osweiler's negligent and reckless pain management treatment of Becky McIlrath ("Becky") directly caused Becky to overdose prescription opioids that took her life in November 2017.

4.     Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. ("Endo") purposefully engaged in a deceptive, negligent, reckless and fraudulent marketing campaign and course of conduct intended to, and did in fact, cause Becky's prescribers to negligently and recklessly prescribe opioids for chronic pain to Becky for the purpose of increasing Endo's profits and deprived Becky and her treating physicians of the ability to make informed decisions based on accurate and complete information, which proximately caused the injuries suffered by Becky for which the Plaintiffs seek damages.

## JURISDICTION AND VENUE

5.     The Iowa District Court in and for Polk County has proper jurisdiction over the parties pursuant to Iowa Code § 602.6101.

6.     The amount in controversy exceeds the jurisdictional requirements.

7.     This Court has personal jurisdiction over Defendants as they conduct business in Iowa, purposefully direct or directed their actions toward Iowa, and/or have the requisite minimum contacts with Iowa necessary to constitutionally permit the Court to exercise jurisdiction.

8.     Becky's injuries were sustained at her home in Polk County, Iowa.

9.     Venue is proper pursuant to Iowa Code § 616.18.

## PARTIES

10.     This action is brought by the duly authorized and acting Co-Administrators of the Estate of Becky McIlrath, Polk County Case No. ESPR075345.

11.     At all material times hereto, Plaintiffs James Harley McIlrath IV was the child of Becky and a resident of Grinnell, Poweshiek County, Iowa.

12.     At all material times hereto, G.E.M. was the minor child of Becky and a resident of Grinnell, Poweshiek County, Iowa.

13.     G.E.M. has no legally appointed guardian or conservator.

14.     James Harley McIlrath III is G.E.M.'s father and next friend.

15.     At all times material hereto, Defendant, Thomas Hansen, M.D. (hereafter "Dr. Hansen"), was a physician licensed to practice medicine in Iowa and regularly engaged in the practice of medicine in West Des Moines, Dallas County, Iowa.

16.     At all material times hereto, Dr. Hansen held himself out to the public as a specialist in pain management for treatment of patients in Becky's condition.

17.     At all times material hereto, Defendant, Pier Osweiler, ARNP (hereafter "Osweiler"), was a nurse practitioner licensed to practice in Iowa and regularly engaged in her practice in West Des Moines, Dallas County, Iowa.

18.     Defendant, The Iowa Clinic, P.C., is an Iowa corporation with its principal place of business located in West Des Moines, Dallas County, Iowa.

19.     At all material times hereto, Dr. Hansen was an employee, agent, owner or shareholder of The Iowa Clinic.

20.     At all material times hereto, Osweiler was an employee or agent of The Iowa Clinic.

21.     Defendant, Endo Health Solutions, Inc. is a Delaware corporation with its principal place of business located in Malvern, Pennsylvania.

22.     Defendant, Endo Pharmaceuticals Inc., is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware Corporation with its principal place of business in Malvern Pennsylvania.

23.     Endo Health Solutions Inc. and Endo Pharmaceuticals are collectively referred to as "Endo".

24.     Endo develops, markets, and sells prescription drugs, including Percocet, in Iowa.

4

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

## STATEMENT OF THE CLAIM

*Defendants Dr. Hansen, Osweiler and The Iowa Clinic*

25.     At all times material hereto, Defendant Thomas Hansen, M.D. and Defendant Pier Osweiler, ARNP provided medical services to Becky McIlrath in the form of prescribing pain medication, including but not limited to Percocet.

26.     During the providing of the medical services to Becky, Thomas Hansen, M.D. and Pier Osweiler, ARNP were acting as the agents/employees of The Iowa Clinic, P.C. and were providing medical services to Becky within the scope of that agency/employment.

27.     During the administering of medical services to Becky, Thomas Hansen, M.D. and Pier Osweiler, ARNP negligently treated Becky for non-cancer pain-related issues and such negligence included failing to adequately monitor Becky's opioid prescriptions and use and negligently treating Becky's pain by prescribing opioids for non-cancer chronic pain, including migraine headaches.

28.     During the administrating of medical treatment to Becky up to and including November 16, 2019, Thomas Hansen, M.D. and Pier Osweiler, ARNP owed a duty to Becky to perform the medical services within an acceptable standard of medical care within the medical community and Thomas Hansen, M.D. and Pier Osweiler, ARNP, breached the standard of care by negligently treating Becky's pain, negligently prescribing opioids, and negligently monitoring Becky's opioid use, which led to an overdose of said prescriptions that took Becky's life.

E-FILED   2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

29.     As a direct and proximate result of the breach of applicable standard of medical care by Thomas Hansen, M.D. and Pier Osweiler, ARNP, which resulted in the death of Becky, Becky suffered pain and suffering in the past, loss of income to the estate, past medical expenses, loss of function, and other damages.

30.     The harm and death endured by Becky was the direct and proximate cause of the medical errors committed by Thomas Hansen, M.D. and Pier Osweiler, ARNP.

31.     Thomas Hansen, M.D. did not do what a reasonable, ordinary doctor would do treating Becky.  His treatment deviated from the appropriate standard of care during the treatment he provided to Becky, which directly caused Becky's death.

32.     Pier Osweiler, ARNP did not do what a reasonable, ordinary nurse practitioner would do treating Becky.  Her treatment deviated from the appropriate standard of care during the treatment she provided to Becky, which directly caused Becky's death.

*Endo Defendants[1]*

33.     Before the 1990s, generally accepted medical standards provided that opioids should be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. The use of opioids for chronic pain was discouraged or prohibited.

34.     To expand the market for its opioid products, including Percocet, Endo developed a marketing scheme based on deception.

---

[1]     The allegations asserted herein largely mirror the allegations asserted against Endo in multiple claims brought by governmental entities in other jurisdictions.

6

**059**

35.   Endo used both direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use.

36.   Endo's deceptive, negligent, and fraudulent scheme was designed to, and did in fact, cause prescribers, specifically Becky's prescribers, to negligently and recklessly overprescribe opioid medication for patients in Becky's condition, including Becky.

### A.   Endo Used Multiple Avenues To Disseminate Its False And Deceptive Statements About Opioids.

37.   Endo spread its false and deceptive statements by marketing its branded opioids directly to health care providers, including Becky's prescribers, and patients, including Becky, in Iowa.

38.   Endo also deployed seemingly unbiased and independent third parties that they controlled to spread its false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain to health care providers, including Becky's prescribers, and patients, including Becky, in Iowa.

### 1.   Endo spread false and deceptive statements through direct marketing of its branded opioids.

36.   Endo's branded ads deceptively portrayed the benefits of opioids for chronic pain.

37.   Endo promoted the use of opioids for chronic pain through "detailers" — sales representatives who visited individual doctors and medical staff in their offices — and small-group speaker programs.

38.    Endo also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Endo. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers gave the false impression that they were providing unbiased and medically accurate presentation. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Endo's prior misrepresentations about the risks and benefits of opioids.

39.    Endo employed the same marketing plans and strategies and deployed the same messages in Iowa as they did nationwide. Across the pharmaceutical industry, "core message" development was funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensured that Endo's messages were accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising and in each sales territory.

40.    Eno ensured marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. Endo's sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide

8

**061**

decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### 2. Endo used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids.

41.    Endo also deceptively marketed opioids in Iowa through unbranded advertising – *i.e.*, advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Endo controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Endo controlled the distribution of its "core messages" via its own detailers and speaker programs, Endo similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CMEs, and medical conferences and seminars. To this end, Endo used third-party public relations firms to help control those messages when they originated from third parties.

42.    Endo also marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA. Endo also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source.

43.    Endo used third parties that they funded, directed, and controlled to

9

**062**

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

carry out and conceal its scheme to deceive health care providers, including Becky's prescribers, and patients, including Becky, about the risks and benefits of long-term opioid use for chronic pain.

### a.  Key Opinion Leaders ("KOLs")

44.    Endo also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Endo because their public positions supported the use of opioids to treat chronic pain. These doctors are known as "key opinion leaders" or "KOLs."

45.    Endo paid KOLs to serve as consultants or on its advisory boards and to give talks or present CMEs, and its support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Endo by advancing its marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Endo.

46.    KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. Endo created opportunities for KOLs to participate in research studies Endo suggested or chose and then cited and promoted favorable studies or articles by its KOLs. By contrast, Endo did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

47.    Endo's KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the

E-FILED 2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Endo was able to direct and exert control over each of these activities through its KOLs. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

48.     Pro-opioid doctors were one of the most important avenues that Endo used to spread its false and deceptive statements about the about the risks and benefits of long-term opioid use.  Endo knew that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

49.     Endo utilized many KOLs, including many of the same ones. Two of the most prominent are described below.

### (1)     Russell Portenoy

50.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom Endo identified and promoted to further its marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Endo.

51.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an

11

advocacy organization almost entirely funded in part by Endo.

52.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast in Iowa and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[2]

### (2)   Lynn Webster

53.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Endo. At the same time, Dr. Webster was receiving funding from Endo.

54.     During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the

---

[2]     Good Morning America television broadcast, ABC News (Aug. 30, 2010).

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

Lifetree Clinic have died of opioid overdoses.

55.    Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo.

56.    In 2011, Dr. Webster presented, via webinar, a program titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach Iowa health care providers, including Becky's prescribers.

57.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids. As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), a book that is still available online, when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first

13

**066**

response." Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."

### b.   Front Groups

58.   Endo also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of, *inter alia*, Endo, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted Endo by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Endo.

59.   These Front Groups depended on, *inter alia*, Endo for funding. Endo also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, Endo made sure that the Groups would generate only the messages Endo wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or health care providers treating those patients.

60.   Endo utilized many Front Groups. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards

14

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

### (1)   American Pain Foundation ("APF")

61.    The most prominent of Endo's Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding.

62.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Iowans.

63.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others

E-FILED   2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

64.   APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. APF functioned largely as an advocate for the interests of opioid manufacturers, including Endo, not patients.

65.   In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

66.   APF assisted in other marketing projects for drug companies. One project funded by another drug company – *APF Reporter's Guide: Covering Pain and Its Management* (2009) – recycled text that was originally created as part of the company's training document.

67.   The same drug company made general grants, but even then it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year – this would be a very good issue on which to use some of that. How does that

16

**069**

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

work?"

68.    The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and opioid manufacturers, including Endo. APF's clear lack of independence – in its finances, management, and mission – and its willingness to allow opioid manufacturers, including Endo, to control its activities and messages support an inference that Endo that worked with it was able to exercise editorial control over its publications.

69.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and opioid manufacturers, including Endo, stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

### (2)    American Academy of Pain Medicine ("AAPM")

70.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of opioid manufacturers, including Endo, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

71.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Endo was a member of the council and presented deceptive programs to doctors who attended this annual event.

72.    AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[3]

73.    AAPM's staff understood they and their industry funders were engaged in a common task. Opioid manufacturers, including Endo, were able to influence AAPM through both their significant and regular funding and the leadership of pro-

---

[3]    Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/ viewarticle/500829.

opioid KOLs within the organization.

74.     In addition, treatment guidelines were particularly important in securing acceptance for chronic opioid therapy. They were relied upon by health care providers, including Becky's prescribers, targeted by opioid manufacturers, including Endo. Treatment guidelines not only directly inform health care providers' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo discussed treatment guidelines with doctors during individual sales visits.

75.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The consensus statement remained on AAPM's website until 2011 and was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

76.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

77.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of

addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Endo, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated in Iowa during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

78.    Opioid manufacturers, including Endo, widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

79.    Opioid manufacturers, including Endo, worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, opioid manufacturers, including Endo, combined their efforts through the Pain Care Forum (PCF), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Endo) and various Front Groups, almost all of which received substantial funding from the opioid manufacturers, including Endo. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did

not require mandatory participation by prescribers, which Endo determined would reduce prescribing.

### B. Endo's Marketing Scheme Misrepresented The Risks And Benefits of Opioids.

80. To convince health care providers, including Becky's prescribers, and patients, including Becky, in Iowa that opioids can and should be used to treat chronic pain, Endo had to convince them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those health care providers and patients about the risks and benefits of long-term opioid use, Endo made claims that were not supported by or were contrary to the scientific evidence.

81. Endo's deceptive, negligent, reckless and fraudulent marketing scheme convinced Becky's prescribers and Becky that opioids should be used to treat patients in Becky's condition.

#### 1. Endo falsely trivialized or failed to disclose the known risks of long-term opioid use.

82. To convince health care providers, including Becky's prescribers, and patients, including Becky, that opioids are safe, Endo deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low- risk because most patients would not become addicted,

21

and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

83.    *First,* Endo falsely claimed that the risk of addiction is low, and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Two illustrative examples of these false and deceptive claims are described below:

    a.    Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

    b.    Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain,* which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

84.    The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

85.    The FDA further exposed the falsity of Endo's claims about the low risk

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

of addiction when it announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

86.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York.

87.    *Second,* Endo falsely instructed health care providers and patients that

the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Endo called this phenomenon "pseudoaddiction" – a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL Endo – and falsely claimed that pseudoaddiction is substantiated by scientific evidence.

88.    For example, Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

89.    The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

90.    Endo has effectively repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the State of New York, in its

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Consistent with this, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

91.    *Third,* Endo falsely instructed health care providers, including Becky's prescribers, and patients, including Becky, that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. Endo's misrepresentations made these health care providers feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.

92.    For example, Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

93.    Once again, the 2016 CDC Guideline confirms the falsity of these misrepresentations. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts,

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

urine drug testing, or pill counts widely believed by doctors to detect and deter abuse — "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

94.     *Fourth*, to underplay the risk and impact of addiction and make health care providers feel more comfortable starting patients on opioids, Endo falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

95.     For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

96.     Endo deceptively minimized the significant symptoms of opioid withdrawal which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction — and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to

prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

97.     *Fifth*, Endo falsely claimed that health care providers, including Becky's prescribers, and patients, including Becky, could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Endo's efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, health care providers, including Becky's prescribers, would have abandoned treatment when patients, including Becky, built up tolerance and lower dosages did not provide pain relief. Two illustrative examples are described below:

a.      Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

b.      Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on Endo's website. In Q&A format, it asked "If I take the opioid now, will it

27

**080**

work later when I really need it?" The response is, "The dose can
be increased. You won't 'run out' of pain
relief."

98.   These claims conflict with the scientific evidence, as confirmed by the

FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-

dose opioids for chronic pain are not established" while the "risks for serious harms

related to opioid therapy increase at higher opioid dosage." More specifically, the CDC

explains that "there is now an established body of scientific evidence showing that

overdose risk is increased at higher opioid dosages." The CDC also states that "there

is an increased risk for opioid use disorder, respiratory depression, and death at

higher dosages."

99.   The 2016 CDC Guideline reinforces earlier findings announced by the

FDA. In 2013, the FDA acknowledged "that the available data do suggest a

relationship between increasing opioid dose and risk of certain adverse events." For

example, the FDA noted that studies "appear to credibly suggest a positive

association between high-dose opioid use and the risk of overdose and/or overdose

mortality."

100.   These numerous, longstanding misrepresentations of the risks of long-

term opioid use spread by Endo successfully convinced health care providers,

including Becky's prescribers, and patients, including Becky, to discount those risks

and ultimately caused Becky's overdose.

### 2. Endo grossly overstated the benefits of chronic opioid therapy.

101.   To convince health care providers and patients that opioids should be

used to treat chronic pain, Endo also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Endo falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

102.    For example, Endo falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples are described below:

  a.    Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

  b.    *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo, among others, taught that relief of pain by opioids, by itself, improved patients' function.

  c.    Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not

able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

d.  Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

e.  Endo's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

103.  These claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is <u>no good evidence</u> that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

a.  "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

b.  "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

c.  "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed,

such as low back pain, headache, and fibromyalgia."

104.    The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

105.    Endo also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that health care providers and patients would look to opioids first for the treatment of chronic pain. For example, the Endo-sponsored CME put on by NIPC, *Persistent Pain in the Older Adult*, counseled that acetaminophen should be used only short-term and includes five slides on the FDA's restrictions on acetaminophen and its adverse effects, including severe liver injury and anaphylaxis (shock). In contrast, the CME downplays the risk of opioids, claiming opioids have "possibly less potential for abuse than in younger patients," and does not list respiratory depression among the adverse effects.

106.    Endo routinely failed to disclose in its educational and marketing materials the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy," in which the patient becomes more sensitive to certain painful stimuli over time; or experiences hormonal or endocrine dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome ("NAS") (when an infant exposed to opioids prenatally painfully withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazepines, which are often also

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

used by pain patients to treat post-traumatic stress disorder and anxiety.

107.    Once    again,    these    misrepresentations    by    Endo    contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

### C.    Endo Knew That Its Marketing Of Opioids Was False And Deceptive, It Fraudulently Concealed Their Misconduct.

108.    Endo made, promoted, and profited from its misrepresentations about the risks and benefits of opioids for chronic pain even though it knew that its misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Endo of this, and Endo had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Endo's misrepresentations, and Endo has recently entered agreements

prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

109.   Moreover, at all times relevant to this Complaint, Endo took steps to avoid detection of and to fraudulently conceal its deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, Endo disguised its own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. Endo purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Endo's false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

110.   Endo also never disclosed its role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Endo exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement.

111.   Finally, Endo manipulated its promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Endo distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for Endo's deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could

33

E-FILED   2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

it have been detected by the Plaintiffs.

112.   Thus, Endo successfully concealed from the medical community (including Becky's prescribers) and patients (including Becky) facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. The Plaintiffs did not know of the existence or scope of Endo's industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**D.   Endo's Deceptive, Negligent, Reckless and Fraudulent Marketing Scheme Caused Becky's Opioid Addiction, Overdose, and Death.**

113.   Endo's misrepresentations deceived health care providers, including Becky's prescribers, and patients, including Becky, about the risks and benefits of long-term opioid use.

114.   Studies also reveal that many health care providers and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them.

115.   Endo's deceptive, negligent, reckless and fraudulent marketing scheme caused Becky's prescribers to prescribe opioids for her chronic pain conditions such as headaches and migraines.

116.   Absent Endo's deceptive, negligent, reckless and fraudulent conduct, Becky's prescribers would not have negligently and/or recklessly overprescribed opioids to treat her pain and/or otherwise mismanaged her pain treatment, which caused Becky's eventual overdose and death.

117.   Endo's deceptive, negligent, reckless and fraudulent conduct also caused

34

**087**

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

Becky to purchase and use opioids for her chronic pain believing they were safe and effective.

118.    Absent Endo's deceptive, negligent, reckless and fraudulent marketing scheme, Becky would not have used opioids to treat her headaches and migraines and/or would have used less of them.

119.    Endo's deceptive, negligent, reckless and fraudulent marketing scheme was a proximate cause of Becky's opioid dependency, overdose, and death.

120.    Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses.

121.    Contrary to Endo's misrepresentations, most opioid addiction, including Becky's addiction, began with legitimately *prescribed* opioids, and therefore could have been prevented had Endo's representations to Becky's prescribers been truthful.

122.    Endo's creation, through negligent, reckless, false and deceptive advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed families throughout Iowa, including Becky's family.

123.    Endo knew and should have known about these harms that its deceptive, negligent, reckless and fraudulent marketing has caused. Endo closely monitored its sales and the habits of prescribing health care providers. Endo's sales representatives, who visited health care providers and attended CMEs, knew which

health care providers were receiving their messages and how they were responding. Endo also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. It knew – and, indeed, intended – that its misrepresentations would persuade health care providers, including Becky's prescribers, to prescribe and patients, including Becky, to use their opioids for chronic pain.

124.   Endo's actions are not permitted nor excused by the fact that its drug labels may have allowed or did not exclude the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give Endo license to misrepresent the risks and benefits of opioids. Indeed, Endo's misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

125.   Nor is Endo's causal role broken by the involvement of health care providers, including Becky's prescribers. Endo's marketing efforts were ubiquitous and highly persuasive. Its deceptive messages tainted the sources health care providers, including Becky's prescribers, could rely on for information and prevented them from making informed treatment decisions. Endo also was able to harness and hijack what health care providers, including Becky's prescribers, wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

## COUNT I
## PROFESSIONAL NEGLIGENCE
*(The Iowa Clinic, P.C., Thomas Hansen, M.D., and Pier Osweiler, ARNP)*

126.   Plaintiffs reallege and incorporate by reference each of the allegations

contained in the preceding paragraphs of this Petition as though fully alleged herein.

127.    Dr. Hansen was negligent in one or more of the following particulars as to his treatment of Becky McIlrath:

      a.    Failing to prescribe appropriate prescriptions for the treatment of Becky's pain;

      b.    Prescribing opioids for the treatment of Becky's symptoms;

      c.    Failing to properly monitor Becky's opioid prescription and use;

      d.    Failing to discontinue the prescription for opioids for a patient in Becky's condition;

      e.    Continuing to prescribe opioids for the treatment of Becky's condition until her death;

      f.    Failing to use the degree of skill, care and learning ordinarily possessed and exercised by other physicians in similar circumstances; and

      g.    Failing to use the degree of skill, care and learning ordinarily possessed and exercised by pain management specialists in similar circumstances.

128.    Pier Osweiler, ARNP, was negligent in one or more of the following particulars as to her treatment of Becky McIlrath:

      a.    Failing to prescribe appropriate prescriptions for the treatment of Becky's pain;

      b.    Prescribing opioids for the treatment of Becky's symptoms;

      c.    Failing to properly monitor Becky's opioid prescription and use;

      d.    Failing to discontinue the prescription for opioids for a patient in Becky's condition;

      e.    Continuing to prescribe opioids for the treatment of Becky's condition until her death;

    f.    Failing to use the degree of skill, care and learning ordinarily possessed and exercised by other nurse practitioners in similar circumstances; and

129.    Said negligence is the cause of injury and damage to Becky and Plaintiffs.

130.    The Iowa Clinic, by and through the acts of its agents, staff, employees and contracted employees were negligent in the handling of Becky's medical care.

131.    The Iowa Clinic is liable for the negligence of Dr. Hansen and Osweiler because it had a nondelegable duty to Becky to provide competent medical care for its services.

132.    At all material times, Dr. Hansen was acting within the scope of his employment with The Iowa Clinic.

133.    At all material times, Osweiler was acting within the scope of her employment with The Iowa Clinic.

134.    At all material times, agents, staff, employees, and contracted employees of The Iowa Clinic who provided medical services to Becky were acting within the scope of their employment with The Iowa Clinic.

135.    At all material times, The Iowa Clinic represented and advertises that Dr. Hansen, Osweiler and its medical providers are employees and/or agents of The Iowa Clinic.

136.    Becky McIlrath believed from these facts that Dr. Hansen, Osweiler and The Iowa Clinic's medical providers were employees/agents with apparent authority of The Iowa Clinic.

137.   The Iowa Clinic is responsible for the negligence of its agents, staff employees, and contracted employees under theories of vicarious liability, respondeat superior, employer-employee liability, and/or principal agent.

138.   As a result of the negligence of Dr. Hansen, Osweiler and The Iowa Clinic, the Plaintiffs have suffered and incurred damages, which include, but are not limited to, losses to the present value of the decedent's estate, lost interest on burial expenses, personal injury, physical pain, mental suffering, mental anguish, emotional trauma, and other damages.

### COUNT II
### COMMON LAW NEGLIGENCE
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

139.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

140.   Endo had a duty of care to Plaintiffs to exercise the degree of care which a reasonably careful person would use under similar circumstances and to conduct its business of manufacturing, promoting, marketing, and/or distributing opioids in compliance with applicable State law.

141.   Endo breached its duties through its false and misleading statements and omissions, and/or its violations of Iowa law, in the course of manufacture, distribution, sale, and/or marketing of opioid drugs within the State of Iowa.

142.   Endo breached its duty of care by making and/or disseminating deceptive statements, including, but not limited to, the following:

  a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive

statements;

b.    Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.    Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

d.    Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.    Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.    Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.    Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.    Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.    Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this

population;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

143.  As a foreseeable consequence of Endo's breaches of its duties, Becky and Plaintiffs suffered direct and consequential damages.

144.  Endo's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute recklessness, gross negligence, and willful and wanton conduct.

## COUNT III
## FAILURE TO WARN
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

145.  Plaintiffs reallege and incorporate by reference each of the allegations

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

contained in the preceding paragraphs of this Complaint as though fully alleged herein.

146.   Endo sold or distributed Percocet.

147.   Endo is engaged in the business of selling or distributing Percocet.

148.   Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.   Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

d.   Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.   Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.   Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.   Providing significant financial support to pro-opioid KOLs,

42

095

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.   Providing needed financial support to pro-opioid pain organizations — including over $5 million to the organization responsible for many of the most egregious misrepresentations — that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.   Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.   Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.   Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.   Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

149.   Endo's statements deemphasized, diluted, and played down the effect of

warnings otherwise provided by Endo in the sale or distribution of Percocet.

150.   The foreseeable risks of harm posed by Percocet could have been reduced or avoided by the provision of reasonable instructions or warnings and the absence of deceptive statements regarding Endo's opioid products.

151.   The omission of the instructions or warnings and Endo's overpromotion, dilution, deemphasis, and playing down of its warnings rendered Percocet not reasonably safe for patients in Becky's condition.

152.   The omission of the instructions or warnings and Endo's overpromotion, dilution, deemphasis, and playing down of its warnings was a proximate cause of Plaintiffs' damages.

153.   Endo's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute recklessness, gross negligence, and willful and wanton conduct.

## COUNT IV
## COMMON LAW FRAUD
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

154.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

155.   As alleged herein, Endo engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

156.   Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

     a.   Creating, sponsoring, and assisting in the distribution of

patient education materials that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high- risk patients;

d.  Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.  Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and

45

**098**

misrepresented the risks of opioid addiction in this population;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

157.  These false representations and concealments were reasonably calculated to deceive the Becky's prescribers and consumers of its opioid products, including Becky, were made with the intent to deceive, and did in fact deceive Becky and the physicians who prescribed Endo's opioid products to Becky.

158.  But for these false representations and concealments of material fact, Becky would not have become addicted to overdosed from Endo's opioid products.

159.  As a direct and proximate cause of Defendants' fraudulent conduct,

46

**099**

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

Becky and Plaintiffs have been injured.

### COUNT V
### CONSUMER FRAUD
*(Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.)*

160.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

161.    The Iowa Consumer Frauds Act, Iowa Code ch. 714H, prohibits, in connection with consumer transactions, unfair, deceptive, false, sales practices that mislead consumers about the nature of the product they are receiving.

162.    As alleged herein, Endo, at all times relevant to this Complaint, violated the Iowa Consumer Frauds Act by making deceptive representations about the use of opioids to treat chronic non-cancer pain.

163.    Endo also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Endo's omissions rendered even their seemingly truthful statements about opioids deceptive.

164.    Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

    a.    Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

    b.    Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c.    Creating and disseminating paid advertisement supplements in academic journals promoting chronic

opioid therapy as safe and effective for long term use for high-risk patients;

d. Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary

data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non- cancer pain to Iowa prescribers through in-person detailing.

165.  These false representations and concealments were reasonably calculated to deceive the Becky's prescribers and consumers of its opioid products, including Becky, were made with the intent to deceive, and did in fact deceive Becky and the physicians who prescribed Endo's opioid products to Becky.

166.  But for these false representations and concealments of material fact, Becky would not have become addicted to overdosed from Endo's opioid products.

167.  As a direct and proximate cause of Defendants' fraudulent conduct, Becky and the Plaintiffs have suffered actual damages.

168.  By engaging in the conduct set forth above, Endo acted willfully and wantonly toward Plaintiffs entitling Plaintiffs to statutory damages up to three times the amount of actual damages.

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

### COUNT VI
### LOSS OF CONSORTIUM – G.E.M.
*(All Defendants)*

169.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

170.   As a direct and proximate result of the negligence of all Defendants, G.E.M. has suffered and will continue to suffer in the future the following injuries and damages:

    a.   Past and future loss of financial support from her mother Becky McIlrath; and

    b.   Past and future loss of consortium with her mother Becky McIlrath.

### COUNT VII
### LOSS OF CONSORTIUM – James H. McIlrath IV
*(All Defendants)*

171.   Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

172.   As a direct and proximate result of the negligence of all Defendants, James H. McIlrath IV has suffered and will continue to suffer in the future the following injuries and damages:

    a.   Past and future loss of financial support from his mother Becky McIlrath;

    b.   Past and future loss of consortium with his mother Becky McIlrath.

### COUNT VIII
### PUNITIVE DAMAGES (Iowa Code §668A.1)
*(All Defendants)*

173.   Plaintiffs reallege and incorporate by reference each of the allegations

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

contained in the preceding paragraphs of this Petition as though fully alleged herein.

174.    By engaging in the conduct set forth above, Endo acted toward Plaintiffs with oppression, fraud, malice, gross negligence, willful and wanton, and/or reckless disregard for Becky's rights, her health, her physical and mental well-being, so as to inflict the damage complained of.

175.    By engaging in the conduct set forth above, Dr. Hansen, Osweiler and The Iowa Clinic acted toward Plaintiffs with oppression, fraud, malice, gross negligence, willful and wanton, and/or reckless disregard for Becky's rights, her health, her physical and mental well-being, so as to inflict the damage complained of.

176.    Accordingly, in addition to the actual damages herein alleged, Plaintiffs are entitled to an award of exemplary damages because of Defendants' conduct.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against The Iowa Clinic, Thomas Hansen, M.D., Pier Osweiler, ARNP, Endo Health Solutions Inc., and Endo Pharmaceuticals, Inc., in a reasonable amount adequate to compensate for Plaintiffs' injuries with interest and costs as provided by law, including actual, general and for punitive and exemplary damages as provided by law, attorneys' fees, together with interest as provided by law and the costs of this action.

## JURY DEMAND

Plaintiffs hereby demand a jury trial of all issues contained herein so triable in this action.

E-FILED  2019 NOV 13 5:03 PM POLK - CLERK OF DISTRICT COURT

Respectfully submitted,

*/s/ Scott M. Wadding*
Scott M. Wadding  AT0010447
SEASE & WADDING
104 Southwest Fourth Street
Des Moines, Iowa 50309
Telephone: (515) 883-2222
Facsimile: (515) 883-2233
swadding@seasewadding.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2019, I electronically filed the foregoing document with the Clerk of Court using the EDMS system which sent notifications of said filing to all EDMS participants.

E-FILED  2019 NOV 20 2:43 PM POLK - CLERK OF DISTRICT COURT

# Affidavit of Process Server

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

ESTATE OF BECKY MCILRATH, ET AL.     VS   THE IOWA CLINIC, P.C., ET AL.

PLAINTIFF/PETITIONER                    DEFENDANT/RESPONDENT                    CASE NUMBER

I DENORRIS BRITT _____ being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.   RECEIVED 11/11/19

**Service:** I served ENDO PHARMACEUTICALS, INC. _____
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) ORIGINAL NOTICE; PETITION AT LAW & JURY DEMAND

by leaving with AMY MCLAREN                    MANAGING AGENT                    At
☐ Residence        NAME                          RELATIONSHIP
                   ADDRESS                        CITY / STATE
☒ Business   C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
             ADDRESS                              CITY / STATE

On_____11/11/19_____AT_____12:30 PM_____
        DATE                              TIME

Thereafter copies of the documents were mailed by prepaid, first class mail on_____
                                                                        DATE

from_____
        CITY          STATE              ZIP

**Manner of Service:**
☒ CORPORATE
☐ **Personal:** By personally delivering copies to the person being served.
☐ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of_____ and explaining the general nature of the papers.
☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
☐ **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

☐ **Non-Service:** After due search, careful inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address    ☐ Moved, Left no Forwarding    ☐ Service Cancelled by Litigant ☐ Unable to Serve in Timely Fashion
☐ Address Does Not Exist ☐ Other_____

**Service Attempts:** Service was attempted on: (1)_____    (2)_____
                                            DATE      TIME        DATE      TIME
(3)_____    (4)_____    (5)_____
    DATE      TIME        DATE      TIME        DATE      TIME

AGE   40   Sex FEMALE Race  W   Height 5'5   Weight  110    HAIR BROWN

_____
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this 11TH   day of NOVEMBER   , 2019.

_____
SIGNATURE OF NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires September 14, 2020

NOTARY PUBLIC for the state of   DELAWARE

E-FILED  2019 NOV 20 2:43 PM POLK - CLERK OF DISTRICT COURT

# Affidavit of Process Server

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

ESTATE OF BECKY MCILRATH, ET AL.        VS    THE IOWA CLINIC, P.C., ET AL.

| PLAINTIFF/PETITIONER | DEFENDANT/RESPONDENT | CASE NUMBER |

I DENORRIS BRITT                being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.   RECEIVED 11/11/19

**Service:** I served ENDO HEALTH SOLUTIONS, INC.
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) ORIGINAL NOTICE; PETITION AT LAW & JURY DEMAND

by leaving with AMY MCLAREN                MANAGING AGENT                At
☐ Residence        NAME                    RELATIONSHIP
                   ADDRESS                  CITY / STATE
☒ Business    C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
                   ADDRESS                  CITY / STATE

On        11/11/19                    AT        12:30 PM
          DATE                                  TIME

Thereafter copies of the documents were mailed by prepaid, first class mail on
                                                                    DATE
from
      CITY              STATE              ZIP
**Manner of Service:**
☒ CORPORATE
☐ **Personal:** By personally delivering copies to the person being served.
☐ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of _____ and explaining the general nature of the papers.
☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
☐ **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

☐ **Non-Service:** After due search, careful inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address    ☐ Moved, Left no Forwarding    ☐ Service Cancelled by Litigant ☐ Unable to Serve in Timely Fashion
☐ Address Does Not Exist ☐ Other

**Service Attempts:** Service was attempted on: (1)_____ (2)_____
                                                 DATE    TIME         DATE    TIME
(3)_____ (4)_____ (5)_____
    DATE    TIME     DATE    TIME     DATE    TIME

AGE    40    Sex FEMALE Race  W   Height 5'5   Weight  110      HAIR BROWN

_____
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this 11TH  day of NOVEMBER     ,2019.

_____
SIGNATURE OF NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires September 14, 2020

NOTARY PUBLIC for the state of  DELAWARE

**107**